THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:25-CR-5-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| JAMES DARNELL FELTON, JR., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court upon defendant's motion to suppress (DE 24) and amended motion to suppress (DE 27). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Robert T. Numbers, II, entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motions to suppress be denied. (DE 41). Defendant timely filed objections to the M&R, to which the government responded. In this posture, the issues raised are ripe for ruling. For the following reasons, defendant's motions are denied.

## STATEMENT OF THE CASE

Indictment filed April 9, 2025, charges defendant with four counts: 1) possession of ammunition by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924; 2) possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924; 3) possession with intent to distribute a substance containing methamphetamine and marijuana in violation of 21 U.S.C. § 841(a)(1); and 4) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Defendant filed the motion to suppress (DE 24) June 16, 2025, and after receiving new evidence from the government he filed the instant amended motion (DE 27) July 7, 2025. In both motions, defendant seeks to suppress the firearms and controlled substances underlying his federal charges that were obtained during search of a residence following his October 5, 2022, arrest on state charges of first-degree murder and assault with a deadly weapon with intent to kill.

The magistrate judge held hearing January 8, 2026, and thereafter entered the instant M&R February 3, 2026, wherein the magistrate judge recommends the court deny defendant's motions. Defendant timely objected to the M&R, and the government responded to defendant's objections.

## STATEMENT OF FACTS

The court incorporates herein for background purposes the facts set forth in the M&R.

In late August 2022, an officer with the Elizabeth City Police Department responded to reports of a shooting. Probable Cause Aff., D.E. 27–4. Upon arrival, the officer found a victim who had been shot in the head. Id. The victim later died. Id.

An investigation ensued. Law enforcement noted that a pickup truck registered to Felton had been abandoned in the intersection where the shooting occurred with its lights running. Id. Several .40-caliber shell casings were found "beside the truck, in the grass, and on the sidewalk." Id. Shortly thereafter, a North Carolina magistrate issued a warrant for Felton's arrest on charges of first-degree murder and assault with a deadly weapon with intent to kill. Report of Investigation by Deputy U.S. Marshal Nathaniel Mason, D.E. 27–5.

About five weeks later, in October 2022, law enforcement learned that Felton was at 1140 Four Forks Road in Elizabeth City. Id. Local law enforcement and the United States Marshals Service then began a joint operation to arrest him for the outstanding warrant. Investigative Report of Jason Wheelbarger, D.E. 27–1.

Local law enforcement began surveilling that property on the morning of October 5, 2022. Mason Report. While there, they witnessed a woman later identified as Kayla Munden ["Munden"] drive away from the property. Id. Officers eventually stopped and questioned her. Id. She told the officers that no one else was at the home and agreed to return with them to allow them to search the property. Id. She also said that she only knew Felton through media coverage. Id. But the

officers did not believe her. Id. And when they followed her back to the house, she appeared to be making wrong turns to delay returning to her home. Id.

Meanwhile, the officers who remained at the home attempted to coax Felton outside. Id. They used a speaker system to call him out of the home. Id. Officers noted a white Ford Mustang parked near the back door. Hr'g Tr. at 22:10–11. And there were two other vehicles also nearby. Id. at 44:12–14, 53:10–24. The length of the grass near them and the surrounding items indicated that these two vehicles may not have been moved recently, but there was no indication they were inoperable. Id. After about 10 minutes, Felton exited through the home's back door and was arrested. Mason Report.

Deputy U.S. Marshal Nathaniel Mason and other officers then conducted a protective sweep of the home. Id. He claimed the protective sweep was justified because "local officials were planning on executing a search warrant" and because Munden was "lying about occupants in the residence." Id. During the protective sweep officers found multiple firearms in plain view. Id. After satisfying himself that no one else was in the house, Mason went back outside. Id.

After the sweep, Munden arrived back at the home. Report of Kevin Burgess, D.E. 27–2. She told officers that there was a handgun in the house along with "a couple other weapons that she inherited from her mother[.]" Id. But Munden could provide no details about the firearms. Id.

Jason Wheelbarger and TL Meads, investigators with the Pasquotank County Sheriff's Office, left to apply for a search warrant. Report at 1–2, D.E. 27–1. The affidavit accompanying the search warrant application discussed the August 2022 shooting, the evidence law enforcement located in the shooting's immediate aftermath, Felton's arrest at the home on Four Forks Road, and the items located during the protective sweep. Probable Cause Aff. at 4–5, D.E. 27–4. But the affidavit did not mention Munden's statement that she owned the firearms in the house.

A North Carolina judge then issued a warrant allowing officers to search the home for evidence related to the murder, including guns, ammunition, and shell casings. Search Warrant, D.E. 27–4. When they served it, officers found drugs and more firearms. Mason Report.

In April 2025, a federal grand jury indicted Felton on drug and firearm charges. Indictment, D.E. 1. Felton filed a motion to suppress . . . and then filed an amended motion shortly thereafter. D.E. 24, 27. The court held an evidentiary hearing in January 2026. Order, D.E. 37. The government presented the testimony of Mason, Wheelbarger, and Task Force Officer Jason Dear. Hr'g Tr. at 2. The government also presented as evidence eleven exhibits including photographs, satellite images, and copies of warrants. Exh. List, D.E. 40.

3

(M&R (DE 41) at 2-4).

**COURT'S DISCUSSION**

A.      Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed.  28 U.S.C. § 636(b).  The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations."  Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).[1]  Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R.  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983).  Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

B.      Analysis

Defendant primarily raises objection to the M&R's conclusion that the "officers were aware of reasonable and articulable facts which, when taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the home harbored an individual posing a danger to those on the arrest scene." (Def's Obj. (DE 45) at 1). The court first analyzes this objection and the lawfulness of the protective sweep at issue, before turning to defendant's objections to specific legal and factual determinations in the M&R.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "[S]earches

---

[1]      Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

One such exception applies where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Kentucky v. King, 563 U.S. 452, 460 (2011). The types of exigent circumstances that justify a warrantless seizure include, among other things, the "imminent destruction of evidence," United States v. Brown, 701 F.3d 120, 126 (4th Cir. 2012), and "risk of danger to the police or to other persons inside or outside the dwelling." United States v. Moses, 540 F.3d 263, 270 (4th Cir. 2008).

Officers also may perform a "protective sweep" of a home when they believe "that the area to be swept harbors an individual posing a danger to those on the arrest scene." United States v. Laudermilt, 677 F.3d 605, 610 (4th Cir. 2012). A protective sweep is permissible "if the searching officer possessed a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing that that the area swept harbored an individual posing a danger to the officer or others." Maryland v. Buie, 494 U.S. 325, 327 (1990).

"The linchpin of the protective sweep analysis is not the threat posed by the arrestee, but the safety threat posed by the house, or more properly by unseen third parties in the house." United States v. Jones, 667 F.3d 477, 484 (4th Cir. 2012). "[A] protective sweep is circumscribed, however, extending only to a cursory inspection of those spaces where a person may be found, and lasting no longer than it takes to complete the arrest and depart the premises." Id. at 483.

Furthermore, "a lack of information cannot provide an articulable basis upon which to justify a protective sweep." Id. at 484.

Here, the officers arrived at 1140 Four Forks Road in Elizabeth City to arrest defendant for murder and assault with a deadly weapon. (Hr'g Tr. at 9:4–10:6-21). They initially gathered outside the residence and conducted surveillance. (Id. at 11:2–14:15). Approximately 30 minutes after the officers arrived, Munden, who was unknown to the officers at the time, got into a vehicle and left the property. (Id. at 15:11–16:5). After Munden left the home three vehicles remained parked outside the residence. (Id. at 43:25-44:14).

Some of the officers at the scene followed Munden and conducted a traffic stop. (Id. at 16:8-13). During this encounter, Munden falsely told the officers that no one else was at the residence, and that she did not know defendant except through the news media coverage. (Id. at 17:5-9). She then offered to allow the officers to follow her and search the premises. (Id. at 17:9-11). Munden, however, made a series of wrong turns in an effort to delay the following officers from returning to the residence. (Id. at 18:24-19:2)

At the residence, the remaining officers began commanding anyone inside the home to exit. (Id. at 18:4-19-20). Defendant left the home after approximately ten minutes, and officers arrested him without incident. (Id. at 19:16-24). Shortly after defendant's arrest, the officers conducted the protective sweep at issue, locating three firearms in the home. (Id. at 54:15-25).

Under the totality of the circumstances, these are "specific and articulable facts which, taken together with the rational inferences from those facts," create a reasonable belief "the area swept harbored an individual posing a danger to the officer or others." Buie, 494 U.S. at 327.

First, it is reasonable to suspect there would be additional dangerous individuals and potential firearms in the location where a murder suspect is present and attempting to evade

6

detection by law enforcement.  See United States v. Jackson, 100 F.3d 950 (4th Cir. 1996) (affirming where "the district court found the protective sweep for additional persons to be reasonable given that the agents knew that [the defendant] was wanted for attempted murder and that he was considered armed and dangerous."); United States v. Everett, 91 F.4th 698, 710 (4th Cir. 2024) (discussing principle that district court may consider the underlying charges when determining whether a protective sweep was justified).

Next, Munden intentionally misled officers. Munden stated she did not know defendant and no one else was in the residence.  (Id. at 17:5-9).  Both of these facts were false.  Munden then led officers away from the home. (Id. at 18:24-19:2).  These actions justified the officers' inference that Munden did not want officers to know who was inside the home.

While defendant's arrest may have occurred outside the home, "an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home."  Jones, 667 F.3d at 485 n.10.  Moreover, the presence of multiple cars outside the home creates a reasonable inference there are more people inside.  See id. at 485 ("[A] reasonably prudent officer would suspect that there were other individuals inside the Jones residence because there were seven vehicles parked on the property at 1:00 in the morning, yet only the two Joneses were known to reside there.").

Defendant took approximately ten minutes to exit the home after instructions from officers. (Id. at 19:16-24).  Such a long delay in exiting also creates a reasonable inference of danger or coordination with another party, especially considering the multiple vehicles out front.

These facts, taken individually, may not rise to the level of justifying a protective sweep. But the court must consider the totality of the surrounding circumstances in conducting a reasonableness analysis under the Fourth Amendment.  See, e.g., United States v. Foster, 634 F.3d

243, 246 (4th Cir. 2011); <u>United States v. Cheatham</u>, 601 F. App'x 194, 198 (4th Cir. 2015) ("[C]onsidering the totality of the circumstances, police legally conducted a protective sweep of the residence."). Based on the totality of the circumstances here, the court agrees with the magistrate judge that the officers had a reasonable belief based on specific and articulable facts the area swept posed a danger to them.

Turning next to defendant's objections to specific legal or factual findings in the M&R, defendant first contests the finding that multiple vehicles on the property suggest multiple people were inside the residence. Specifically, defendant argues two of the vehicles appeared to have been stationary for a prolonged period of time, with one car having long grass in front of its wheels. But even assuming the vehicles had been stationary for a lengthy period, in the circumstances here that does not negate an inference that multiple people are inside of the residence.

Based on the testimony at hearing, the officers determined the vehicles at the scene appeared operable, which itself supports the officers' reasonable inference that multiple individuals were inside. (<u>See</u> Hr'g Tr. 45:1-46:9). Further supporting this inference is the fact that the officers observed Munden exit the residence, get into a vehicle parked on the property, and drive away. Given the foregoing, together with the absence of evidence indicating the vehicles had been abandoned, the fact that the grass length and other conditions of the vehicles suggested they had been parked there for a significant period of time does not change the analysis. Thus, the presence of additional vehicles together with other facts discussed above provide support for the officers' reasonable belief that other individuals posing a danger to them were inside the residence. <u>See</u> <u>Jones</u>, 667 F.3d at 485.[2]

---

[2] Defendant also objects to the M&R's finding that, because defendant left his vehicle at the scene of the alleged crime, none of the vehicles on the property belonged to him. At hearing, the officers did not testify that they knew defendant allegedly left his vehicle at the scene. But even accepting defendant's objection, two vehicles remain at the scene unaccounted for, and the court's analysis does not change.

8

The underlying rationale for the protective sweep doctrine is to ensure officer safety when making an arrest at a private residence where the officers are working under dangerous circumstances in unfamiliar surroundings. See Buie, 494 U.S. at 327 ("A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."). In the tense and uncertain circumstances of arresting a suspect charged with first degree murder, the court will not require law enforcement to undertake careful investigation of the conditions of the vehicles or surrounding landscape before conducting a protective sweep. As noted above, the officers here reasonably inferred that multiple people were present at the residence from their direct observation that multiple operable vehicles were parked there. In the absence of evidence indicating the vehicles were abandoned or otherwise inoperable, that inference is supported by the record. See Jones, 667 F.3d at 485.

Defendant also objects to considering the underlying offense in justifying a protective sweep. However, as discussed above, courts consider the nature of the underlying offense when evaluating a protective sweep. See Everett, 91 F.4th at 710. Defendant is correct that "[t]he linchpin of the protective sweep analysis is not the threat posed by the arrestee, but the safety threat posed by the house, or more properly by unseen third parties in the house." Jones, 667 F.3d at 484. It is the nature of the underlying offense, however, that may inform the potential danger to officers. See, e.g., Everett, 91 F.4th at 710. For instance, where the underlying allegation was a murder using a firearm, the officers reasonably could infer there would be firearms in the home where defendant was found, and where the multiple vehicles suggested others may be in the residence, these individuals could access any potential firearm. See United States v. Laudermilt, 677 F.3d 605, 611 (4th Cir. 2012) ( "[U]naccounted-for third parties with access to firearms may present a grave danger to arresting officers."); see also United States v. Anderson, 851 F.2d 727,

9

729 (4th Cir. 1988) (discussing in the context of a search warrant that "[i]t was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his residence.").

Defendant objects to this reasoning as well, arguing that the officers did not specifically testify about concerns related to potential firearms at the scene. The officers did, however, know defendant was charged with first-degree murder and assault with a deadly weapon. (Hr'g Tr. at 10:6-21). Therefore, it is a reasonable inference from the facts known to the officers that the danger posed to them involved firearms.

Next, defendant "objects to the Court's use of Ms. Munden's conduct or statements during the investigative stop in its analysis of the protective sweep given that the testimony showed that she was two to three miles away from the residence." (Def's Obj. (DE 45) at 2). Defendant further objects to using Munden's statements, arguing "that officers would have had no more and no less information regarding who was in the house had they never encountered Ms. Munden at all and therefore did not impact their assessment of who was inside." (Id. at 2-3).

As set forth above, Munden's statements are relevant because she lied to officers, stating that no one was at the residence and that she did not know defendant. (See Hr'g Tr. at 17:5-9). Paired with Munden's attempt to lead officers away from the residence, there is a clear inference she did not want officers to know who was inside the home. Attempting to conceal individuals from law enforcement creates a reasonable inference of danger. See Jones, 667 F.3d at 484-85 (stating a false claim "no one else was in the residence" as a factor that supported a protective sweep). But again, this is only one of many facts at issue, and the court must consider the totality of the circumstances. See Foster, 634 F.3d at 246; Cheatham, 601 F. App'x at 198.

Defendant also argues that the "lack of knowledge about who was in the house" is not an appropriate consideration based on Jones. But the basis for a protective sweep is danger posed

"by unseen third parties in the house." <u>Jones</u>, 667 F.3d at 484. Here, just as in <u>Jones</u>, the officers had "specific articulable facts underlying the officers' suspicions that other dangerous individuals could be in the [] residence[,]" <u>id.</u>, such as the parked cars, and that these parties may present a danger. The fact that the officers did not know who was in the residence is not an impermissible "lack of knowledge" under <u>Jones</u> when specific facts create an inference of danger and suggest other parties may be inside.

Defendant also objects to the magistrate judge considering defendant took approximately 10 minutes to exit, as "no officer testified to seeing any movement inside the house, any noises coming from the house, or seeing anything from outside the house." (Def's Obj. (DE 45) at 3). As noted, multiple, apparently operable, cars were at the residence. (<u>See</u> Hr'g Tr. 45:1-46:9). Munden also lied to officers that no one was at the residence, when, in fact, at minimum defendant was at the residence. (<u>Id.</u> at 17:5-9). Thus, when considered together with the remaining evidence discussed above, the delay in leaving the residence reasonably supports the inference that other individuals were present, notwithstanding the fact that the officers did not detect movement or other noises from their vantage points outside the residence.

Lastly, defendant also objects to the M&R's citation to <u>United States v. Silva</u>, 865 F.3d 238 (5th Cir. 2017), and argues it conflicts with the Fourth Circuit's holding in <u>Jones</u>. First, <u>Silva</u> is not germane to the court's analysis, nor was it central to the magistrate judge's. But, in any event, <u>Silva</u> did not rely on a lack of information to justify a protective sweep. There, the officers also relied on specific, articulable facts when deciding to conduct a protective sweep, such as knowledge of the defendant's gang involvement, information there were firearms inside the residence, and that the defendant delayed in exiting the residence. <u>Silva</u>, 865 F.3d at 242. Accordingly, <u>Silva</u> does not conflict with <u>Jones</u>, and the magistrate judge did not err by citing it.

Lastly, defendant objects "for purposes of preserving the issue for appeal, to the M&R to the extent that the Court did not reach the issue of whether the search warrant affidavit was supported by probable cause." (Def's Obj. (DE 45) at 4). The M&R did address this issue, finding that the "[b]ecause the sweep did not violate the Fourth Amendment, the firearms were not fruit of the poisonous tree, and the officers could point to them in the warrant application." (M&R (DE 41) at 4 n.4). Where the court also finds the protective sweep lawful, it was proper rely upon the firearms in the warrant affidavit, and therefore the court also finds the warrant was supported by probable cause.

In sum, officers conducted a lawful protective sweep after arresting defendant, and defendant's objections to the contrary are unavailing.

## CONCLUSION

Based on the foregoing, the court ADOPTS the recommendation of the M&R (DE 41) and DENIES defendant's motions to suppress (DE 24, 27).

SO ORDERED, this the 14th day of July 2026.

_____
LOUISE W. FLANAGAN
United States District Judge

12